RECEIVED
APR 30 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

HENRY E. MAZUREK and PAULA NOTARI,

                                    *Plaintiffs*,

-- against --

DAVID H. BROOKS,

                                    *Defendant*.
-------------------------------------------------------------------X

Case No.1:07-cv-03103 (DAB) (AJP)

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Henry E. Mazurek and Paula Notari, by their attorneys, Judd Burstein, P.C., complaining of the Defendant, allege as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that this is a civil action between citizens of different States where the amount in controversy exceeds $75,000.

2.     Venue lies in this District pursuant to 28 U.S.C. § 1391(a)(3) by reason of an exclusive forum selection clause in the agreement sued upon herein.

## PARTIES

3.     Plaintiff Henry E. Mazurek ("Mazurek") is a citizen of the State of New Jersey. Mazurek attended Georgetown University as an undergraduate, where he was awarded a significant scholarship.  In 1990, Mazurek graduated with a Bachelor of Science degree in Business Administration. He graduated with highest honors and as class valedictorian.  Mazurek went on to study at Harvard Law School, where he earned his Juris Doctor degree in 1993.  Following his graduation from law school, Mazurek received a federal clerkship with the Honorable Franklin Van Antwerpen of the United States District Court for the Eastern District of Pennsylvania.  Mazurek

then joined the law firm of Swidler & Berlin in Washington, D.C. as an associate in its litigation and legislative affairs groups. After spending two years at the law firm, Mazurek decided that his real desire was to practice criminal defense, and he obtained a position at the San Diego Federal Public Defender's Office. Mazurek spent four years practicing as a federal defender before he moved to New York, where he joined the law firm of Kramer Levin Naftalis & Frankel, LLP as an associate in their "white collar" criminal defense group. In 2002, Mazurek moved to the law firm of renowned criminal defense attorney Gerald L. Shargel, where Mazurek continued to develop his practice in the criminal law. In 2006, Mazurek became a partner in Mr. Shargel's law firm, and by that time he was earning a significant six figure salary. Based upon his compensation formula, moreover, Mazurek stood to earn significant additional monies if he stayed on as Mr. Shargel's partner.

4.      Plaintiff Paula Notari ("Notari"), also a citizen of New Jersey, is Mazurek's wife and also an attorney concentrating in criminal defense. Notari left her employment as a public defender with the Brooklyn Defender Services based upon Defendant's representations concerning Mazurek's future employment.

5.      On information and belief, although Defendant David Brooks ("Defendant" or "Brooks") has alleged that he is a citizen of the State of New York, he is in fact a citizen of the State of Florida.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A.    The Inception of the Parties' Relationship

6.      Brooks is the former Chief Executive Officer of DHB Industries, Inc. ("DHB"). A significant aspect of DHB's business consists of supplying the United States military with body armor for use by service men and women stationed in Iraq and Afghanistan. DHB was publicly

2

traded on the American Stock Exchange until it was de-listed in or around July 2006 for failure to satisfy SEC filing obligations. According to SEC filings by DHB, Brooks was placed on forced administrative leave by the Board of Directors in or around that same time period.

7.      In connection with his association with DHB, Brooks was also named as a defendant in a class action lawsuit venued in the United States District Court for the Eastern District of New York, styled *In re DHB Industries, Inc.*, 05 CV 4296 (E.D.N.Y. 2005) (Seybert, J.) (the "Class Action Suit"). The Class Action Suit alleges in part that Brooks improperly profited by, *inter alia*, concealing from the public DHB's potential liabilities arising from its having sold defective body armor.

8.      On or about August 16, 2006, a federal indictment was filed in the Eastern District of New York against two former DHB executives, its Chief Financial Officer, Dawn Schlegel, and its Chief Operating Officer, Sandra Hatfield. The indictment charged various federal felonies, including conspiracy to commit securities fraud, securities fraud, and insider trading. The indictment also references unindicted co-conspirator(s). Media accounts have reported that Brooks is also a subject of the ongoing DHB federal criminal investigation.

9.      Accordingly, in or around early September 2006, Brooks sought to retain the services of the Law Offices of Gerald Shargel. At the outset, Mazurek was the attorney with the Shargel law firm who had principal responsibility for handling Brooks' matter.

10.      Initially, the bulk of Mazurek's work for Defendant required his presence in London, England. Mazurek thus began spending significant amounts of time in London with the Defendant beginning in September 2006.

3

11.    Brooks also required a transactional attorney located in London, and Defendant retained Sarangua "Sara" Davaadorj, a lawyer practicing in London who Mazurek had met while at Harvard Law School where she was a foreign LLM student.

12.    By October 2006, Ms. Davaadorj ceased performing legal services for Defendant. While Mazurek did not know it at the time, Ms. Davaadorj later informed him that commencing in October 2006, Brooks began calling her and demanding that she return her legal fees. Following Ms. Davaadorj's retention, however, Mazurek did witness Brooks treat her (over Mazurek's objection and without provocation) in an abusive, demeaning, belligerent and threatening manner that is consistent with Brooks' overall course of conduct as detailed *infra*.

13.    Shortly after Mazurek's representation of Brooks began, Brooks sought to retain Mazurek's services exclusively and independent of his agreement with Mr. Shargel. Mazurek, however, was reluctant to abandon his promising practice with Mr. Shargel. Furthermore, representing Brooks full time would require Plaintiffs to move to London indefinitely. Also, at the time, Plaintiff Notari was satisfying her career goals as a public defender with the Brooklyn Defender Services. Accordingly, a decision by Mazurek to work full time with Brooks in London would uproot Plaintiffs from their career paths, their living arrangements, and proximity to family and friends.

14.    After extensive negotiations, and with Mr. Shargel's consent, in November 2006, Mazurek and Brooks entered into a written agreement, on a "general retainer" basis, pursuant to which Defendant promised to pay Mazurek $3,000,000 for three years of service as Defendant's personal lawyer, with an initial payment of $1 million due upon signing.

4

15.    The agreement, in the form of a letter from Mazurek to Brooks, further provides:

[A]s I have explained to you, by making myself available to you without limitation, I am leaving a highly respected and successful law firm in which I worked for nearly five years and in which I am a partner; I will be restricted in terms of other clients I can service; it may be necessary for me to do extensive traveling which has significant disruptive effects on my professional life and my personal life; and I am otherwise exclusively reducing the scope of my law practice in your favor. I would not leave my current firm were it not for my specific reliance on the fact that I will receive the full three (3) million dollars – $3,000,000.

16.    In reliance upon this agreement, Mazurek, *inter alia*, resigned from a lucrative law partnership, moved to London, and performed under the parties' agreement by working extensive hours and on most weekends for Brooks until, as discussed *infra*, Defendant breached the agreement.

17.    The first $1 million due under the contract was paid to Mazurek on November 14, 2006.

**B.    Defendant's Campaign of Abusive, Violent, Sexual, and Harassing Conduct Toward Plaintiffs Begins**

18.    After Mazurek entered into his general retainer agreement with Brooks, Brooks engaged in a continuous course of unreasonable and abusive conduct toward Mazurek, including, but not limited to: repeated verbal abuse, including screaming, foul language and degrading comments, all made without provocation; threatening and intimidating taunts at Mazurek, again without provocation; obscene comments directed to and about Plaintiff Notari; repeated obscene sexual advances towards Notari; and engaging in other conduct that made it unreasonably difficult for Mazurek to carry out his professional responsibilities consistent with his ethical obligations as a member of the New York Bar.

19.    With respect to Notari, Brooks engaged in an outrageous pattern of conduct, which included, but was not limited to, telephone calls and in-person conversations, some of which

occurred in New York or while Notari was in New York, during which Brooks would repeatedly attempt to engage Notari in vulgar and unwanted conversation. Brooks' conduct included multiple profane and obscene comments concerning, *inter alia,* Notari's anatomy that are so repulsive that they will not be recounted here. On one occasion when Notari was in London and Mazurek had excused himself to make a telephone call, Brooks urged Notari to engage in unwanted sexual activity with him. When Notari responded with utter disgust, Brooks only pressed his advances.

20.    Brooks appeared to take pleasure in making Notari feel uncomfortable through his repeated sexual references and suggestions to Notari that she was not a good wife because she did not dress in a sufficiently "sexual" manner. On numerous occasions, Brooks, using explicit and vulgar terms, purported to give Notari unsolicited advice about her appearance.

21.    Despite repeated and loud protests by Mazurek that Brooks should immediately cease this conduct toward his wife, Brooks persisted. However, as Mazurek had just signed on for a three year term as Brooks' counsel (and abandoned his promising practice with Mr. Shargel to do so), Plaintiffs did their best to cope with Brooks' harassing and disruptive behavior, hoping that the situation would improve. That was not to be the case.

22.    On a number of occasions, Brooks used threats and intimidation to assert his control over Plaintiffs. One such occasion took place over the 2006 Christmas Holidays. Mazurek traveled from London to the United States for a few days to visit his widower father and family. Upon Mazurek's return, Brooks expressed outrage that Mazurek had made a court appearance in the United States District Court for the Southern District of New York on the morning of December 26, 2006.

6

23.     Mazurek explained to Brooks that a personal court appearance had been ordered by the judge for the purpose of hearing Mazurek's application to be substituted out as appointed counsel for a client Mazurek had represented prior to his engagement with Brooks. The substitution of counsel appearance was part of Mazurek's winding down of his prior practice in order to devote all of his time professionally to Defendant.

24.     Nonetheless, Brooks, in the presence of both Mazurek and Notari, violently threatened Plaintiffs for defying and talking back at him. Defendant also screamed at Notari: "You are a fu**ing pig!" Brooks continued his diatribe by telling Notari that she was a "greedy fu**ing pig - I was nice enough to let Henry go home and you take advantage of it by taking an extra day." Brooks's claim that Mazurek took an extra day off from work was false.

25.     Brooks then, standing over his desk, screamed in words or substance at Plaintiffs: "I'll kill you if you ever lie to me again. You know me by now and I don't make idle threats. I have guys to take care of you. "

26.     Mazurek responded that Brooks should not threaten or scream at his wife or him; that his court appearance had been ordered by the Judge, and was simply to remove himself as counsel for a former client.

27.     Brooks, however, only repeated his threats that "[i]f you ever challenge me again, I will have my people take care of you."

28.     Plaintiffs took Brooks' statement to be a threat that Defendant would have them hurt or killed, and they were placed in fear for their safety.

7

**C.    Defendant's Pattern of Threatening Behavior Toward Third Parties Puts Plaintiffs in Continued Fear For Their Own Safety**

29.    Starting in September 2006, while Mazurek was still working for Shargel, Mazurek and Brooks began the process of establishing an office database with the assistance of computer vendors. After execution of an agreement with these vendors, however, Brooks refused to pay the vendors' invoices, and threatened them repeatedly, ignoring Mazurek's protests. For example, Mazurek heard Brooks berate vendors that "[y]ou aren't going to get away with this with me - you are fu*king dead - you better give me my stuff or I'll send my guys after you." One threat Mazurek heard Brooks make was that "I'm going to carve your face and peel it over your head!" Despite Mazurek's repeated protests over this conduct, Brooks persisted.

30.    Brooks' threats were not limited to the computer vendors. Mazurek also heard Brooks berate a British solicitor, telling him that "unless you give me my money back, I'll kill you and your family." Brooks repeatedly used threatening language in conducting his business. This conduct rendered it unreasonably difficult for Mazurek to carry out his professional responsibilities and caused him to fear for his own physical safety.

**D.    Brooks' Continued Harassment and Threats Against Plaintiffs**

31.    During early January 2007, Mazurek was involved in finding a replacement for Mr. Shargel, who had withdrawn as counsel for Defendant. During this time frame, Mazurek and Brooks would often travel between England and the United States, stopping in New York and staying in Defendant's apartment in Boca Raton, Florida.

32.    One morning, Brooks unexpectedly informed Mazurek that they would be traveling to Boca Raton on his private jet that same day. Accordingly, Notari met her husband at Grand

8

Central Station to give Mazurek his suitcase for the trip. When Notari arrived and met Mazurek, Brooks was present but speaking with someone on the telephone. Mazurek excused himself to go to the restroom and asked Notari to watch his personal belongings. Brooks ended his phone conversation and walked over to Notari. Brooks took this opportunity to make repeated unwanted and unsolicited lewd comments to Notari concerning her anatomy.

33.     During the course of Mazurek's employment with Brooks, Plaintiffs resided in Florida for much of the month of January 2007. During this time, Brooks continued his campaign of harassment and threats toward Plaintiff Notari. Brooks ignored Mazurek's protests over his wife's treatment. On one occasion, Brooks exploded at Notari and threatened: "You hear what happened to Anna Nicole last night? That's where you're headed!" Anna Nicole Smith had been found dead the night before, and Notari feared for her safety.

**E.    The Representation Ends**

34.     In February 2007, the parties returned to London. On the morning of February 20, 2007, Mazurek was working on the first floor of the three story townhouse which housed Brooks' London offices. Brooks' office was on the third floor. On this morning, Sara Davaadorj, who, as noted earlier, is the attorney Mazurek knew from Harvard with whom Brooks had a fee dispute, arrived at the offices to meet with Brooks. Ms. Davaadorj appeared at the office with her female colleague, another attorney who sometimes worked with Ms. Davaadorj. Ms. Davaadorj and her colleague went to Brooks' third floor office to meet with him.

35.     While working on the first floor of the offices, Mazurek heard shouts from upstairs, and he went upstairs to see what was happening. When Mazurek entered Brooks' third floor office, he found that Brooks and his brother had taken possession of the handbags and mobile telephones

9

of Ms. Davaadorj and her female colleague, and were refusing to allow them to leave the premises unless Ms. Davaadorj returned the legal fees Brooks had paid her some months earlier.

36.     In Mazurek's presence, Brooks told Ms. Davaadorj, who is a single mother, that he would "slit the throats" of her children and force her to "watch while they bled to death" if she did not return the fees that he had paid to her firm. Brooks also threatened Mazurek for getting involved in "his business" and ordered him to leave the room. With Ms. Davaadorj looking on horrified, Mazurek told Brooks that his conduct was criminal, and that he should stop immediately. Mazurek then escorted the women from the building, but without their belongings.

37.     While Mazurek and the women were on the street, Brooks then appeared on a third floor terrace and violently threw the women's telephones and bags down at the three of them on the street below. The women took their belongings and fled the area. Mazurek re-entered the building to confront Brooks about his conduct. Brooks, however, angrily terminated Mazurek's services and demanded the return of his fees.

38.     After witnessing Brooks' behavior, and fearful for his safety as well that of his wife, Mazurek took his personal belongings and left the office to return to the apartment where he knew Notari was staying. Brooks, however, emerged from the office building, and ran after Mazurek down the public street screaming: "Where do you think you are going? You aren't going to leave this city alive!" Mazurek, who wanted to avoid any further violent and aggressive behavior by Brooks, told him that they would speak later when Brooks had calmed down and stopped threatening him and his wife.

39.     Mazurek telephoned his wife from the street and informed her that she must immediately pack up their belongings. Mazurek then rushed to the apartment where Notari was

staying and told her that they needed to get out of the apartment immediately. Brooks, however, soon arrived at the apartment and, using keys that he had, entered it to find that Plaintiffs had begun packing. Brooks proceeded to confront them, pacing up and down the apartment, seething with rage.

40.    Brooks grabbed a cord lying in the apartment and began whipping it violently toward Plaintiffs, placing them in immediate fear for their physical safety. While whipping the cord in the air, Brooks yelled "You're packing ... where you going? Where you going? You're leaving?" Brooks threatened Mazurek that he "wasn't going to get away with leaving" Brooks, and that he would "take Mazurek down" if he dared to defy him.

41.    Brooks stood in front of Mazurek and began wildly whipping a metal table with the cord, yelling profanities and screaming, among other things: "No one  interferes with me getting back my money and gets away with it!" Brooks threatened Mazurek that "I'm not through with you. I want my money. You aren't leaving alive if I don't have my money."

42.    Terrified by Brooks' rage, Notari attempted unsuccessfully to calm Brooks. Brooks continued wildly whipping the table in front of Mazurek and, in the midst of spewing profanities, he violently told Notari that she "should shut up." Then, he began whipping the table next to where Notari was standing, screaming profanities and yelling, among other outrageous comments: "This is how a wife should be treated!" Brooks ultimately stormed out of the apartment. Plaintiffs quickly finished packing, booked a hotel and returned to the United States the next day.

43.    Brooks' conduct, as described above, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

11

44.     Brooks' conduct, as described above, both unreasonably endangered Plaintiffs' safety and caused Plaintiffs to fear for their own safety.

## AS AND FOR A FIRST CLAIM FOR RELIEF BY MAZUREK

(Breach of Contract)

45.     Plaintiffs repeat and reallege all preceding Paragraphs as if fully set forth herein.

46.     By reason of Defendant's breach, Mazurek has been damaged in the amount of at least $2,000,000.

47.     In addition, because Defendant's actions involved egregious conduct to intentionally violate Mazurek's rights and were part of a broader pattern of similar conduct directed at the public generally, punitive damages should be awarded in an amount to be determined at trial, but in no event less than $10,000,000.

## AS AND FOR A SECOND CLAIM FOR RELIEF BY PLAINTIFFS

(Assault)

48.     Plaintiffs repeat and reallege all preceding Paragraphs as if fully set forth herein.

49.     By reason of the foregoing, Defendant committed the tort of civil assault against both Plaintiffs.

50.     Plaintiffs are thus entitled to actual damages in an amount to be proven at trial.

51.     In addition, because Defendant's conduct involved gross, wanton, or willful fraud or other morally culpable conduct, punitive damages should be awarded in an amount to be determined at trial, but in no event less than $10,000,000.

12

## AS AND FOR A THIRD CLAIM FOR RELIEF BY PLAINTIFFS

(Intentional Infliction of Emotional Distress)

52.     Plaintiffs repeat and reallege all preceding Paragraphs as if fully set forth herein.

53.     By reason of the foregoing, Defendant has intentionally inflicted emotional distress upon both Plaintiffs.

54.     Plaintiffs are thus entitled to actual damages proven at trial.

55.     In addition, because Defendant's conduct involved gross, wanton, or willful fraud or other morally culpable conduct, punitive damages should be awarded in an amount to be determined at trial, but in no event less than $10,000,000.

## AS AND FOR A FOURTH CLAIM FOR RELIEF BY PLAINTIFFS

(Negligent Infliction of Emotional Distress)

56.     Plaintiffs repeat and reallege all preceding Paragraphs as if fully set forth herein.

57.     By reason of the foregoing, Defendant has negligently inflicted emotional distress upon both Plaintiffs.

58.     Plaintiffs are thus entitled to actual damages proven at trial.

59.     In addition, Defendant's conduct did not amount to mere ordinary negligence, but in fact was flagrant, morally culpable and wanton.  As a result, punitive damages should be awarded in an amount to be determined at trial, but in no event less than $10,000,000.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     On Plaintiff Mazurek's First Cause of Action, damages in the amount of at least $2,000,000 plus punitive damages;

B.    On Plaintiffs' Second, Third, and Fourth Causes of Action, damages in an amount

to be proven at trial, plus punitive damages;

C.    Costs and Disbursements of this Action;

D.    Attorneys fees to the extent provided by law; and

E.    Such other and further relief as deemed just and proper by this Court.

Dated: New York, New York
       April 30, 2007

JUDD BURSTEIN, P.C.

By_____
Judd Burstein (JB-9585)
Peter B. Schalk (PBS-8257)
1790 Broadway, Suite 1501
New York, New York 10019
Tel:    (212) 974-2400
Fax:    (212) 974-2944
*Attorneys for Plaintiffs*

14